# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MICHAEL TURK, | CASE NO. 1:20-CV-02157-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Christopher Michael Turk filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying supplemental security income ("SSI"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 23, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a report and recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 20, 2020). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM in part** and **REVERSE in part** the Commissioner's decision, and **REMAND** this matter for additional proceedings consistent with this Report and Recommendation.

PROCEDURAL BACKGROUND

Mr. Turk filed for SSI on March 21, 2018, alleging a disability onset date of March 5, 2016. (Tr. 223). His claims were denied initially and on reconsideration. (Tr. 87-101, 103-17). He then requested a hearing before an Administrative Law Judge. (Tr. 137-39). Mr. Turk (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 2, 2019. (Tr. 41).

In an October 31, 2019 written decision, the ALJ found Mr. Turk not disabled. (Tr. 7-25). The Appeals Council denied Mr. Turk's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455, 416.1481). Mr. Turk timely filed this action on September 23, 2020. (ECF #1).

FACTUAL BACKGROUND

I. ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Turk and VE George Coleman III as presented during the hearing before the ALJ.

Mr. Turk stays with a friend who lives on the second floor of an apartment building. (Tr. 47, 58). He takes the elevator to the second floor. (Tr. 47). The laundry facilities are directly across the hall from Mr. Turk's unit. (Tr. 48). Before moving in with his friend, Mr. Turk lived in a house with his sister. (Tr. 61). He drives and has a handicapped sticker. (Tr. 49).

Mr. Turk used to work in various restaurants. (Tr. 52). He has been head chef and has managed restaurants. (Tr. 53). These jobs typically required Mr. Turk to be on his feet sixty hours a week. (*Id.*). In these roles, Mr. Turk had to lift bags of produce weighing up to 75 pounds and pots of sauce weighing up to 100 pounds. (Tr. 54).

Mr. Turk has not worked since March 2016 because of his hips. (*Id.*). He was unable to walk at all and used a walker. (*Id.*). His doctor told Mr. Turk that he needed new hips. (Tr. 55). Mr. Turk explained he has financial difficulties and was unable to secure health insurance, which kept him from getting the required surgery. (*Id.*). Once he obtained health insurance coverage, Mr. Turk suffered a heart attack, further delaying right hip replacement surgery. (*Id.*). As a result of the heart attack, Mr. Turk had five stents inserted. (Tr. 59). He is worried about stress and pacing himself. (*Id.*). He notices some shortness of breath in heat and humidity, and when walking. (Tr. 68).

Mr. Turk underwent surgery to replace his right hip on October 25, 2018; as of the hearing before the ALJ, he still needed to schedule surgery on his left hip. (Tr. 55, 59). Mr. Turk testified that, as a result, he was still unable to bend over. (Tr. 56). After the right hip surgery, Mr. Turk received at-home physical therapy. (Tr. 58). Mr. Turk's surgeon said the surgery was successful, but Mr. Turk continued to claim something was not right. (Tr. 56). The surgeon explained that this was because Mr. Turk still needed surgery on his other hip. (Tr. 56, 57).

Mr. Turk testified that after his hip surgery, he tried to return to work in the kitchen at Fifth Avenue Deli in Beachwood, Ohio. (Tr. 49). The restaurant's owner, Dominic Ina, who is a friend of Mr. Turk, told Mr. Turk he would not be able to employ him in the kitchen. (Tr. 49-51). Mr. Turk was only able to stand for about an hour in the kitchen before needing to sit down. (Tr. 68). Mr. Turk cannot move fast enough to keep with the kitchen's pace, cannot get underneath the coolers and refrigerators, and can no longer bend and lift. (Tr. 49-50, 54).

At the time of the hearing, Mr. Turk testified his right hip "is okay but it still hurts." (Tr. 57). Before the surgery, Mr. Turk's pain was "outrageous." (Tr. 63). He described the post-surgical

residual pain as stiff and achy, "like a sciatic nerve." (Tr. 62). Since the surgery, Mr. Turk's legs are different lengths, which, according to Mr. Turk's surgeon, will cause more pain. (Tr. 64). Mr. Turk does not have "good days" anymore. (Tr. 69). Mr. Turk also expressed difficulty reaching forward and lifting his arms overhead due to pain in his shoulders. (Tr. 70). He has received injections in both shoulders. (*Id.*).

Mr. Turk uses a cane for standing, balance, and ambulation. (Tr. 64). Using a cane takes some pressure off his hips. (*Id.*). When not using the cane, Mr. Turk leans or holds onto other surfaces for balance. (Tr. 69). Standing unassisted is painful. (*Id.*).

About a month before the hearing, Mr. Turk received a steroid injection in his left hip. (Tr. 66). He said the injection helped numb the area a bit but is still very uncomfortable and keeps him from sleeping. (*Id.*). Mr. Turk finds it difficult to sleep because he cannot find a position that does not cause pain in his hips. (Tr. 57, 66). He sleeps about two hours each night. (Tr. 67). Mr. Turk does not nap during the day; laying down causes his hips to tighten so he sits upright. (*Id.*).

Mr. Turk's typical day is largely spent watching sports on the television. (Tr. 62). His father passed away about three weeks before the hearing. (*Id.*). Mr. Turk testified to keeping his mother company during that time. (*Id.*). Mr. Turk is responsible for a single room in the apartment, which he can vacuum. (Tr. 61). Mr. Turk will drive to the grocery store, but his friend goes inside to get groceries. (Tr. 60). Mr. Turk cooks a little bit—like ramen noodles—but not to the extent he previously did. (*Id.*). He also does his own laundry. (Tr. 61).

At the hearing, Mr. Turk demonstrated how he stands from a sitting position, and then described the demonstration for the record. (Tr. 65). He pushes himself up using both arm rests, then grabs his cane for balance. (*Id.*).

4

The VE then testified. The VE classified Mr. Turk's past relevant work as a Chef (DOT: 313.131-014, SVP 7). (Tr. 73). The position is considered light work per the DOT, but is heavy work as performed based on the record, and very heavy work as described by Mr. Turk. (*Id.*).

The ALJ then presented a hypothetical to the VE: assume an individual of the same age, education, and experience as Mr. Turk, at light exertion, who can occasionally push and pull with the left upper extremity; can occasionally push and pull with the bilateral lower extremities; can frequently climb ramps and stairs; can never climb ropes, ladders, or scaffolds; can frequently balance; can occasionally stoop, kneel, crouch, and crawl; can frequently perform left overhead, front, and lateral reaching; can frequently be exposed to extreme cold, extreme heat, humidity, fumes, odors, dust, gases, and poor ventilation; and can never be exposed to hazards such as unprotected heights, dangerous machinery, and commercial driving. (Tr. 74). After considering the hazards of the kitchen and the OSHA protections afforded to such workers, the VE responded such an individual could perform Mr. Turk's past relevant work as it is described by the DOT, but not as it was performed by Mr. Turk. (Tr. 74-75).

The VE identified other positions the hypothetical individual could perform, including:

- Food assembler (DOT: 319.484-010; light exertion, SVP 3, semi-skilled), 27,700 jobs in the national economy;

- Food tray assembler (DOT: 319.484-010; light exertion, SVP 3, semi-skilled), 35,240 jobs in the national economy; and

- Cafeteria attendant (DOT: 311.677-014; light exertion, SVP 2, unskilled), 278,470 jobs in the national economy.

(Tr. 76-77).

The ALJ posed a second hypothetical reflecting all the same limitations, but at the sedentary exertion level. (Tr. 77). The VE testified the hypothetical individual would not be able to

5

perform Mr. Turk's past relevant work, as per the DOT or as performed. (*Id.*). The VE testified Mr.

Turk's language, terminology, and knowledge base of food products would directly transfer to

other positions without much vocational adjustment:

- Food and beverage controller (DOT: 216.362-022, sedentary exertion, SVP 5, skilled), 125,200 jobs in the national economy;

- Food checker (DOT: 211.482-014, sedentary exertion, SVP 3, semi-skilled), 219,600 jobs in the national economy; and

- Diet clerk (DOT: 245.587-010, sedentary exertion, SVP 3, semi-skilled), 27,700 jobs in the national economy.

(Tr. 78). The VE testified he based the transferability analysis on the DOT descriptions and that

his testimony is consistent with how the job is performed in today's economy. (Tr. 80-81).

Mr. Turk's counsel cross-examined the VE. If an individual required a cane for balancing,

that individual would be limited to sedentary work because it takes away from the ability to use

one of the upper extremities. (Tr. 79).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Turk was 50 years old at the time of his alleged onset date, and 54 years old at the time

of the administrative hearing. (Tr. 48, 87). Mr. Turk graduated from high school. (Tr. 48). In the

past, Mr. Turk has been employed as a chef. (Tr. 49).

## III.   RELEVANT MEDICAL EVIDENCE

On April 24, 2017, Mr. Turk saw Terence Isakov, M.D., at New Family Physician

Associates. (Tr. 616). Mr. Turk complained of bilateral hip pain for six months and reported

walking bad due to pain. (*Id.*). Dr. Isakov ordered bilateral hip x-rays and gave Mr. Turk a

prescription for hydrocodone-acetaminophen. (Tr. 617). The x-ray of Mr. Turk's left hip showed

advanced arthritic changes in the left hip with severe joint space narrowing with bone against

6

bone, flattening and remodeling of the articular surface of the femoral head and marginal osteophyte complex. (Tr. 329). Mr. Turk returned to Dr. Isakov's office in May, June, July, August, and October 2017, and in January 2018 with the same complaints. (Tr. 611-15). The June treatment record indicates Mr. Turk applied for Medicaid. (Tr. 615).

At the end of January 2018, Mr. Turk was admitted to the hospital with complaints of chest pain. (Tr. 610). Testing revealed Mr. Turk had suffered an acute anterior myocardial infarction, for which he was immediately placed on cardiac catheterization with stent placement. (Tr. 604). He was diagnosed with acute coronary syndrome. (Tr. 606). Three days later, Mr. Turk was discharged. (*Id*).

Mr. Turk attended a follow-up appointment on February 6, 2018, with cardiologist Amir Taraben, M.D. (Tr. 584). Dr. Taraben cleared Mr. Turk to initiate cardiac rehabilitation and ordered him to follow-up with the office in three months. (Tr. 586).

Mr. Turk was advised to wait for one year after his cardiac event before undergoing a right hip replacement; in the meantime, Dr. Isakov referred him to pain management. (Tr. 583). On February 20, 2018, Mr. Turk attended a consultation at Cleveland Clinic's Pain Management Department with Crawford Barnett III, M.D. (Tr. 580). Mr. Turk reported chronic focal hip pain, bilateral but right side greater than left, and left shoulder pain. (*Id*). Mr. Turk described the pain as achy and throbbing; exacerbated by activity, standing, and walking; and relieved with repositioning. (*Id*). Mr. Turk walked with a cane and favored his right hip. (*Id*). Physical examination was normal, revealing normal sensation, normal, full, and symmetric extremity strength without atrophy, and minimal pain to palpation of the greater trochanters. (Tr. 582). Mr. Turk had pain with internal and external ranges of motion at the left shoulder and the right hip.

(*Id*). He had less pain with the left hip. (*Id*). Mr. Turk was scheduled for a right hip joint injection and prescribed gabapentin. (*Id*).

A left shoulder x-ray, dated February 20, 2018, revealed degenerative change at the acromioclavicular joint with subacromial spurring. (*Id*). Pelvis and hip x-rays showed advanced degenerative changes at both hips with chronic appearing flattening/remodeling of the femoral heads. (Tr. 577). The right hip x-ray showed a complete loss of superior joint space, subchondral changes, and osteophytosis. (*Id*).

Mr. Turk received the right hip injection on March 1, 2018 and, fifteen minutes post-procedure, reported 75% pain relief, even with movements that normally provoke his pain. (Tr. 579). During a follow-up phone call on March 8, 2018, Mr. Turk reported just 20% pain relief. (Tr. 578).

Mr. Turk returned to the pain management department on March 21, 2018. (Tr. 574). He reported mild improvement with the injection, but his function remains unchanged. (*Id*). Mr. Turk reported the gabapentin was of slight benefit and that he takes Norco on days he has severe pain. (*Id*). Physical examination was largely normal except Mr. Turk had pain on shoulder and hip range of motion testing. (Tr. 576). He was continued on gabapentin and received additional prescriptions for baclofen and Cymbalta. (Tr. 577). Mr. Turk returned again in April 2018 and was counseled to retry the prescribed medications after he reported he stopped taking them after minimal perceived benefit. (Tr. 573).

Mr. Turk saw his cardiologist on May 31, 2018. (Tr. 569). After a normal examination, Dr. Taraben cleared Mr. Turk to stop his anti-coagulation therapy after July 26, 2018 and said he could undergo surgery around August 2018. (Tr. 571).

8

On September 25, 2018, Mr. Turk met with Michael R. Bloomfield, M.D., for an orthopedic consultation. (Tr. 564). Treatment notes indicate Mr. Turk had trouble getting onto the examination table. (Tr. 567). Dr. Bloomfield discussed the surgery in detail with Mr. Turk and noted Mr. Turk also has significant left hip arthritis described as "bone-on-bone," and discussed that he would experience temporary leg length inequality until he had his left hip replaced. (Tr. 564-67).

Dr. Bloomfield performed the total right hip replacement on October 15, 2018. (Tr. 531-61). There were no complications during the surgery. (Tr. 537-38). Mr. Turk had a steady gait when walking with the assistance of a walker the next day. (Tr. 544). Mr. Turk was able to ascend and descend five stairs. (Tr. 545). Mr. Turk improved each day and was discharged on October 17, 2018. (Tr. 553, 560-61).

On December 13, 2018, Mr. Turk presented at his first post-operative care visit. (Tr. 751-52). Treatment notes indicate he had no complications and was at a normal post-operative stage of recovery. (*Id.*). Anatomical alignment was satisfactory. (Tr. 755). Mr. Turk reported he had started back to work, but was in a lot of pain due to having to stand for four hours at a time. (Tr. 752). Mr. Turk described his pain as aching and a seven on a ten-point scale. (*Id.*). Candace Knuth, PA-C, informed Mr. Turk that it was normal to have discomfort at this point post-operation, but that he could be overdoing it with his return to work. (*Id.*).

Notes from August 20, 2019 again indicate the right hip was in normal alignment post-arthroplasty. (Tr. 764). However, treatment notes indicate the left hip had advanced osteoarthritis. (Tr. 764-65, 768). Dr. Bloomfield indicated Mr. Turk was having lateral-based hip pain on the right. (Tr. 813). X-rays indicated the right hip implants were well-fixed and well-positioned without

any signs of mechanical complication. (*Id.*). However, Mr. Turk has about a 7-10 mm leg length inequality, with the right leg longer than the left. (*Id.*). The inequality results from a very short femoral neck morphology on the left. (*Id.*). The left hip is painful, has a restricted range of motion, with positive FADIR, Faber, and Stinchfield tests. (*Id.*). Dr. Bloomfield noted Mr. Turk's pain may be exacerbated by the leg inequality. (*Id.*). Dr. Bloomfield also noted Mr. Turk is indicated for a left hip replacement. (*Id.*). Mr. Turk was directed to call the office for the left hip replacement when he wishes to schedule the procedure. (*Id.*). Mr. Turk also received a corticosteroid injection in his right trochanteric bursa at this visit. (*Id.*).

## IV.  MEDICAL OPINIONS

State agency medical consultants reviewed Mr. Turk's medical records at the initial and reconsideration levels. At the initial level, the medical consultant determined Mr. Turk's statements regarding his symptoms are fully consistent with the medical evidence. (Tr. 96). The medical consultant performed a residual functional capacity ("RFC") assessment and opined Mr. Turk can lift and carry twenty pounds occasionally, ten pounds frequently; stand and walk for a total of four hours (based on the necessity of a hand-held device for ambulation); sit for a total of six hours in an eight-hour workday; frequently reach overhead, to the front, and laterally with the left upper extremity; occasionally push and pull with the left upper extremity and the bilateral lower extremities; never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dusts, gases, and poor ventilation; and must avoid all exposure to hazards such as unprotected heights, dangerous machinery, and commercial driving. (Tr. 96-98).

10

The consultative examination at the reconsideration level was performed after Mr. Turk's right hip replacement surgery. (*See* Tr. 111). At the reconsideration level, William Bolz, M.D., the medical consultant, noted Mr. Turk's hip condition appeared to be improving after his right hip replacement and that he made some changes to the RFC "so that it is consistent with and supported by the objective medical evidence on file." (Tr. 113, 115). Those changes including finding Mr. Turk can stand and walk for about six hours in an eight-hour workday; frequently climb ramps and stairs, and frequently balance. (Tr. 113-115). The Personalized Disability Explanation stated:

> You said that you were disabled due to a bad hip and a heart attack. The medical evidence shows that your conditions do cause some work-related limitations. However, once you have fully recovered, you will still have the ability to lift and carry lighter items, and to sit, stand, and walk during a workday with normal breaks. You should avoid excessive climbing, balancing, stooping, kneeling, crouching, and crawling. Since you have the ability to do available work once you have fully healed, you cannot be found disabled at this time. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(Tr. 117). Although Mr. Turk's symptoms were assessed as "Durational—Resolving" (Tr. 112), the record indicates Mr. Turk's reports of difficulty ambulating were consistent with the total medical and non-medical evidence, based on x-rays and his obligatory use of an ambulatory aid. (Tr. 113). In addition, Dr. Bolz indicated the RFC assessment should avoid concentrated exposure to cold, heat, humidity, and fumes due to Mr. Turk's cardiac history. (Tr. 115). Dr. Bolz also indicated Mr. Turk used a cane for balance due to his degenerative joint disease; he recommended a limitation to avoid unprotected heights, work around hazardous moving machinery and commercial driving. (*Id.*).

11

## V.    OTHER RELEVANT EVIDENCE

Mr. Turk completed an Adult Function Report, dated June 25, 2018, detailing how his conditions limit his activities. (Tr. 265-72). He is unable to walk, bend, lift, or stand. (Tr. 265). He spends his days sleeping a lot, eating, and sitting outside. (Tr. 266). He tosses and turns all night due to pain. (*Id.*).

Mr. Turk finds it difficult to dress, bathe, and use the toilet. (*Id.*). He has difficulty standing and balancing. (Tr. 266). As to toileting, it is difficult to sit and to wipe himself. (Tr. 266). Mr. Turk prepares his own meals, but only uses the microwave to cook. (Tr. 267). His meals, consisting of soup, salad, and sandwiches, take ten minutes to prepare. (*Id.*). While he is able to do a little bit of laundry, Mr. Turk's friend helps him carry the laundry basket. (*Id.*). He does very little housework and does not often go outside because it is difficult to walk. (Tr. 268). For the same reason, he is not involved in social activities. (Tr. 270). Mr. Turk's conditions affect his abilities to lift, squat, bend, stand, reach, walk, kneel, and climb stairs. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated November 5, 2019, included the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since March 8, 2018, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: acute myocardial infarction, bilateral hip osteoarthritis, status post right total hip arthroplasty, and degenerative joint disease of the left shoulder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can occasionally push/pull with the left upper extremity and occasionally push/pull with bilateral lower extremities. He could frequently climb ramps and stairs, never climb ladders, ropes, and scaffolds, frequently balance, and occasionally stoop, kneel, crouch, and crawl. He could frequently perform left overhead as well as front and lateral reaching. The claimant can be frequently exposed to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. He should never be exposed to hazards, such as unprotected heights, dangerous machinery, and commercial driving.

5.    The claimant is capable of performing past relevant work as a Chef. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.    The claimant has not been under a disability, as defined in the Social Security Act, since March 8, 2018, the date the application was filed. (20 CFR 416.920(f)).

(Tr. 12-21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, this Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, this Court does not review the evidence *de novo*, make credibility determinations, or

weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Turk presents four arguments on review:

1.      The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the Separation of Powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul is constitutionally defective.

2.      The ALJ erred in the formation of her RFC when she failed to properly evaluate the totality of the evidence in the record.

3.      The ALJ erred in her determination regarding credibility as it was not supported by substantial evidence and violated Social Security Ruling 16-3p

4.      The ALJ committed harmful error as her RFC was not supported by substantial evidence when she found that Turk could perform work at the light level of exertion.

(Pl.'s Br., ECF #14, PageID 913). The Commissioner opposes, focusing much of its argument on Mr. Turk's first claim. (Comm'r's Br., ECF #20, PageID 979-1001).

As described below, I agree with the Commissioner's assessment of Mr. Turk's constitutional claim, but I disagree that the RFC was supported by substantial evidence. I also find no basis to reverse based on Mr. Turk's challenge to the ALJ's credibility determinations. Therefore, I recommend the District Court affirm in part, reverse in part, and remand for further proceedings.

**I.      Mr. Turk's constitutional challenge fails.**

Mr. Turk first argues that he was deprived of a valid administrative process because the appointment of the Commissioner of the Social Security Administration, as provided for in 42 U.S.C. § 902(a)(3), is constitutionally invalid. (Pl.'s Br., ECF # 14, PageID 920-21). The Commissioner concedes that § 902(a)(3) violates the separation of powers to the extent it may limit the President's authority to remove the Commissioner of Social Security without cause.

16

(Comm'r's Br., ECF #20, PageID 979; *see also* Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)). But the Commissioner further responds that any such structural defect does not *ipso facto* require setting aside an unfavorable SSA disability benefits determination. (*Id.* at PageID 979-91).

> ### A.    Mr. Turk has not forfeited his ability to challenge the constitutionality of Andrew Saul's appointment.

As a threshold matter, I conclude Mr. Turk has not forfeited his ability to make this constitutional argument. *Carr v. Saul* recently held a claimant does not need to exhaust a constitutional claim at the administrative level, but may first present such a claim at the district court level. 141 S.Ct. 1352, 1362 (2021). However, this rule does not change Sixth Circuit precedent (*see Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537 (6th Cir. 2020)), nor does it change the claimant's requirement to raise the issue in the opening brief or else waive the claim. *Kathrine R. v. Kijakazi*, No. 2:19-CV-00334-FVS, 2021 WL 3854431, at *3-4 (E.D. Wash. Aug. 27, 2021) (finding that *Carr* did not change existing precedent, that claimant could have, but did not, raise an Appointments Clause claim in her opening brief, and accordingly declining to amend or alter judgment).

I therefore proceed to address the merits of Mr. Turk's constitutional argument.

> ### B.    Mr. Turk has not shown a specific, personal harm, and thus he is not entitled to a remand under *Seila Law* or *Collins v. Yellen.*

Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the

17

President of neglect of duty or malfeasance in office." *Id.* Recent Supreme Court cases have held that similar clauses pertaining to other administrative agency heads are unconstitutional violations of the separation of powers. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is unconstitutional); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional). As such, § 902(a)(3) may also violate the separation of powers because it limits the President's authority to remove the Commissioner without cause. *See id.*

Mr. Turk and the Commissioner disagree on the effect, if any, the acknowledged unconstitutional removal restriction of § 902(a)(3) has on Mr. Turk's disability application. Mr. Turk argues he is entitled to remand for a *de novo* hearing. (Pl.'s Br., ECF #14, PageID 921). The Commissioner disagrees, asserting Mr. Turk has not shown that the unconstitutional removal restriction caused the denial of his SSI or DIB claims, among other considerations. (Comm'r's Br., ECF #20, PageID 981-91).

In *Seila Law*, the Supreme Court determined that a single agency head (in that case, the CFPB) who can only be fired for cause violates the Constitution's "take care" clause. *Seila Law, LLC*, 140 S. Ct. at 2197. For the President to execute fully the "take care" duties (as set forth in Article II, Section 1, clause 1 of the Constitution), the President must be able to fire the agency head at-will. Therefore, agencies led by a single director cannot be fully independent; rather, they must be subject to the President's constitutional duty to control federal officers who assist the

President in executing federal law. *Seila Law* further found that the offending clause was severable from the other portions of its Act, thereby maintaining CFPB intact as an agency. *See* 140 S. Ct. at 2208, 2211

*Collins v. Yellen* raises the follow-on question of what remedy, if any, is available to claimants who succeed in a constitutional challenge to an agency's structure. 141 S. Ct. at 1787-89. As with *Seila Law*, the Federal Housing Finance Agency (FHFA) faced a challenge based in the Appointments Clause. The FHFA's agency head had modest limitations on the President's ability to fire the head of the single-director-led agency. The Court concluded that the appointment was unconstitutional for the same reasons as in *Seila Law*, and remanded the case with the instruction that the lower courts determine the appropriate remedy. *Collins* further stated that the removal-power principle applies at all levels within the Executive Branch: "At-will removal ensures that the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Collins*, 141 S. Ct. at 1784.

Mr. Turk asserts the government deprived him of a valid administrative process, because only the Commissioner may make findings of fact and issue final decisions as to benefit eligibility. (Pl.'s Br., ECF #14, PageID 920). In Mr. Turk's view, because the ALJ's authority was delegated from the Commissioner, and because the Commissioner's authority was unconstitutional, the ALJ's ability to make findings of fact and issue a decision was also constitutionally defective. (*Id.*).

Mr. Turk does not, however, address the fact that the specific ALJ who presided over his case—Judge Ma—was not appointed by Andrew Saul, but rather was ratified by then-Acting Commissioner Nancy Ann Berryhill. (*See* Comm'r's Br., ECF #20, PageID 981 n.2). Because Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform

19

Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (noting that FHFA's Acting Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ( "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.").

Because Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between Acting Commissioner Berryhill's ratification of Judge Ma's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude Mr. Turk has not shown that Acting Director Berryhill or Judge Ma lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . ."). Without such nexus, Mr. Turk has not shown he is entitled to a *de novo* hearing under *Collins*. *Id.* at 1787.

Mr. Turk also attempts to connect his alleged harm to Commissioner Saul's failure to step down from the office. (Pl.'s Br., ECF #14, PageID 921) ("Andrew Saul's refusal to step down has

not cured the constitutional defect."). However, this argument is not supported by further explanation; notably, it fails to particularize how Commissioner Saul's refusal to step down in 2021[1] affected Mr. Turk's denial of benefits when Judge Ma issued her decision in this case some nineteen months previous, on November 5, 2019.

Because Mr. Turk has not articulated a specific, personal harm he sustained as a result of the unconstitutional removal provision in § 902(a)(3), his constitutional challenge fails.[2]

## II.    The RFC is not supported by substantial evidence.

Mr. Turk raises a two-pronged attack on the ALJ's determination of Mr. Turk's RFC. First, he argues the ALJ erred when forming the RFC by failing to evaluate the totality of the evidence in the record. (Pl.'s Br., ECF #14, PageID 921-27). Second, Mr. Turk argues the RFC was not supported by substantial evidence when the ALJ found Mr. Turk could perform work at the light level of exertion. (*Id.* at 931-32).

The Commissioner counters that the ALJ reasonably determined Mr. Turk impairments did not meet Listings 1.02 or 1.03, and appropriately determined a cane was not medically necessary. (Comm'r's Br., ECF # 20, PageID 994-95). The Commissioner further asserts

---

[1]      *See* https://www.washingtonpost.com/politics/andrew-saul-social-security-/2021/07/09/c18a34fa-df99-11eb-a501-0e69b5d012e5_story.html (noting that in July 2021, Commissioner Saul "was fired after refusing a request to resign").

[2]      Given this determination, it is unnecessary for me to address the Commissioner's alternative  arguments opposing Mr. Turk's constitutional challenge (harmless error doctrine, de facto officer doctrine, rule of necessity, and broad prudential considerations). (Comm'r's Br., ECF # 20, PageID 985-91). *See, e.g., Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018).

substantial evidence supports the ALJ's finding at Steps Four and Five that Mr. Turk could

perform his past relevant work, as well as work existing in the national economy. (*Id.* at 1000-01).

As described below, I conclude the RFC is not supported by substantial evidence, which

requires that this matter be remanded for further proceedings.

### A.     The RFC was not appropriate to Mr. Turk's abilities.

The ALJ is responsible to form an RFC appropriate to the claimant's abilities, supported by

the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th

Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once

the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in

the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the

nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of

treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc.*

*Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must

determine the "extent to which the symptoms can reasonably be accepted as consistent with the

objective medical and other evidence in the individual's record." *Id.*

The ALJ is not required to implement all suggested limitations and may impose more

restrictions than are set forth in a medical opinion. Doing so does not mean an RFC is not

supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at

*11 (E.D. Mich. Mar. 18, 2015).

With respect to Mr. Turk's use of a cane, SSR 96-9p requires "medical documentation

establishing the need for a hand-held assistive device to aid in walking or standing, and describing

the circumstances for which it is needed." SSR 96-9p. The need for a hand-held assistive device is

not disabling in and of itself. Rather, the ALJ "must always consider the particular facts of a case." *Id.* SSR 96-9 provides examples to guide the ALJ's consideration: if the cane is "needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded." *Id.* If the individual needs to use a cane because of an impairment affecting one lower extremity or to reduce pain when walking, but has no other functional limitations, then that individual may still be able to adjust to sedentary work that exists in significant numbers. *Id.* But for an individual who requires a cane for *balance* due to significant involvement of both lower extremities, the occupational base may be significantly eroded. *Id.* (emphasis added).

The Sixth Circuit has held that if a cane is not medically necessary, it cannot be considered an exertional limitation on the claimant's ability to work. *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). But a cane would be deemed medically necessary if the record reflects more than the claimant's subjective desire to use one. *Id.* In that case, it would trigger an obligation on the part of SSA to conclude the cane is medically necessary and include such limitations in its analysis. *Simpkins v. Berryhill*, No. CV 17-43-DLB, 2017 WL 3821684, at *3 (E.D. Ky. Aug. 31, 2017).

Here, I find the record reflects more than Mr. Turk's subjective desire to use a cane. Mr. Turk appeared to tolerate surgery on one hip well and was able to walk with assistive devices shortly after the surgery. (*See, e.g.*, Tr. 544). However, there is no indication in the record that Mr. Turk's *bilateral* hip issues were resolved after his *right* hip replacement. To the contrary, on reconsideration, consultative examiner Dr. Bolz indicated—notably, *after* Mr. Turk's right hip replacement—that he required a cane for balance due to his degenerative joint disease. (Tr. 115)

23

("Avoid unprotected heights, work around hazardous moving machinery and commercial driving d/t b/l hip DJD and *use of cane for balance*.") (emphasis added).

At a visit in August 2019 (again, ten months after his right hip replacement), Dr. Bloomfield indicated Mr. Turk has severe left hip osteoarthritis, very short femoral neck morphology, lateral-based hip pain on the right, and leg length inequality of 7-10 mm. (Tr. 813). At the hearing, the ALJ observed that Mr. Turk required the use of two hands to raise himself from seated to standing, and then required the use of a cane for balance while standing. (Tr. 65).

Taken together, this evidence indicates a cane was medically necessary for Mr. Turk and triggered an obligation for the ALJ to include such limitations in the RFC analysis. Because that limitation was lacking here, the RFC was not appropriately tailored to Mr. Turk's abilities.

### B. The VE's testimony does not provide substantial evidence to support the ALJ's finding.

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work—what a claimant "can and cannot do." *Id.* An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions.

24

*Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Even so, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue,* No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

An ALJ may rely on a VE's testimony when forming the RFC, so long as the RFC accounts for the claimant's limitations. *Webb*, 368 F.3d at 633. But only the ALJ has the authority to determine a claimant's medical restrictions and the resulting RFC; the VE does not determine which restrictions the claimant in fact has. *Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019). An ALJ may pose a question regarding a hypothetical individual including several limitations, but later determine that the VE's response is not relevant as to the claimant's abilities. *Id.* Requiring that an ALJ rely on the VE's response to the most restrictive question involving a hypothetical individual would controvert the roles of the ALJ and the VE. *Id.*

Asking a hypothetical of a VE is not a finding and does not bind an ALJ to a VE's response. *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020). Rather, a VE's response to a hypothetical serves as substantial evidence of the claimant's ability or lack thereof. *Kessans*, 768 F. App'x at 535-36. And, while a hypothetical posed to a VE need not include a list of a claimant's ailments, it must present a complete picture of the claimant's limitations. *Foster v. Halter*, 279 F.3d 348, 356 (6th Cir. 2001); *see also Webb*, 368 F.3d at 633.

Here, the ALJ's did not include Mr. Turk's need for a cane in the hypotheticals posed to the VE; thus, the hypotheticals did not reflect all of Mr. Turk's potential limitations. As a result, the ALJ cannot rely on the VE's testimony as substantial evidence to support the RFC finding.

On cross-examination, the VE testified that if a hypothetical individual required a cane for balancing, it would require an accommodated work setting and would limit the individual to

25

sedentary work. (Tr. 79). And, although the VE identified certain sedentary jobs during the hearing, the sedentary hypothetical did not include a need to use a cane for balance. (Tr. 77-78). The hypotheticals posed to the ALJ were not reflective of what Mr. Turk can and cannot do. Therefore, the ALJ may not rely on the VE's testimony as substantial evidence to support her findings at Step Five.

I therefore recommend the District Court remand for a new hearing and RFC determination.

## III.    The ALJ did not err in her credibility determination and did not violate SSR 16-3p.

Finally, Mr. Turk alleges the ALJ erred in her credibility determination in violation of SSR 16-3p. (Pl.'s Br., ECF #14, PageID 928-30). The Commissioner responds that the ALJ appropriately evaluated Mr. Turk's subjective statements against the record and that the ALJ's determination was supported by substantial evidence. (Comm'r's Br., ECF # 995-99).

An ALJ follows a two-step process for evaluating an individual's symptoms. In Step One, the Commissioner determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In Step Two, the Commissioner evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. *Id.*

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones,* 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any

26

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

Here, the ALJ recounted Mr. Turk's subjective statements of his impairments due to his "bad hip and heart attack." (Tr. 15). The ALJ stated:

> He reported he cannot walk, bend, lift, or stand, and cannot work as a chef . . . . He also reported he has difficulty managing his personal care due to balance issues, receives assistance with some household chores, and goes outside very little because it is hard to walk. The claimant noted he uses an assistive device when walking.

(*Id.*). The ALJ described Mr. Turk's subjective statements as "inconsistent because the objective evidence failed to substantiate the alleged degree of limitations." (*Id.*). The ALJ then reviewed Mr. Turk's medical record, including Mr. Turk's reports of pain contained within it. (*Id.*). The ALJ also noted the treatment plans for Mr. Turk's conditions, the subjective reports noted by his physicians, and his recovery after procedures. (Tr. 16). Ultimately, the ALJ found that "the record failed to support limitations of the level and severity as [Mr. Turk] alleged." (Tr. 17). The ALJ supported this with Mr. Turk's conservative treatments for his cardiac and left shoulder

27

impairments, his demonstrated improvement with his hip impairment, and his ability to live alone and engage in daily activities. (Tr. 17-18).

Although Mr. Turk has pointed out evidence in the medical record that cuts against the ALJ's determination, he has not pointed to a failure by the ALJ to follow the procedure outlined in SSR 16-3p. Instead, his argument invites a re-weighing of the evidence, which is outside the permissible scope of this court's review. Accordingly, I find no basis to recommend on the District Court reverse the ALJ on this basis. *See Biestek v. Comm. of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("[A] decision supported by substantial evidence must stand, even if we might decide the question differently based on the same evidence.").

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM in part** and **REVERSE in part** the Commissioner's decision denying supplemental security income, and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: December 23, 2021

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

***ANY OBJECTIONS*** to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).